UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| ex rel. UNIVERSITY LOFT COMPANY | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CA NO. A-15-CV-0588LY |
| | § | |
| BLUE FURNITURE SOLUTIONS, LLC | § | |
| XMILLENIUM, LLC, | § | |
| YINGQING "JEFF" ZENG, and | § | |
| ALEXANDER C. CHENG | § | |
| | § | |
| | § | |
| Defendants. | § | |

## UNITED STATES' COMPLAINT IN INTERVENTION
## AND DEMAND FOR JURY TRIAL

Plaintiff, the United States of America, by and through the United States Attorney, files this Complaint in Intervention, alleging as follows:

## PRELIMINARY STATEMENT

Pursuant to 31 U.S.C. § 3730(b)(4)(A), the United States of America brings this Complaint in Intervention seeking damages and civil penalties from Blue Furniture Solutions, LLC, XMillenium, LLC, Yingquing "Jeff" Zing, and Alexander C. Cheng, under the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733. Alternatively, this action seeks to recover damages under the common law theory of unjust enrichment.

The United States files this Complaint in Intervention based on defendants' knowing and fraudulent evasion of millions of dollars of anti-dumping duties and Customs fees owed on wooden bedroom furniture imported from the People's Republic of China from 2011

1

through 2015.  As part of their scheme to defraud the United States of anti-dumping duties and other fees, defendants falsely identified their imports as not subject to anti-dumping duties, falsely described their merchandise as items not subject to anti-dumping duties, and undervalued the merchandise on documents submitted to U.S. Customs and Border Protection ("Customs" or "CBP"), a component of the U.S. Department of Homeland Security.  As a result of these actions, defendants avoided millions of dollars in duties and fees owed to the United States.

## PARTIES

1.      Plaintiff is the United States of America.  The United States Department of Commerce (Commerce) is the agency responsible for imposing anti-dumping duties on products it determines are being sold at less than fair market value or are benefitting from unfair government subsidies.  United States Customs and Border Protection (Customs), an agency within the Department of Homeland Security, is responsible for collecting anti-dumping duties and other Customs fees.

2.      Relator University Loft Company is an Indiana Corporation having its principal place of business in Greenfield, Indiana.  Relator is engaged in the furniture business, including in the sale of wooden bedroom furniture.  Relator initiated this case by filing a complaint on behalf of the United States pursuant to 31 U.S.C. § 3730(b)(1).

3.      Defendant Blue Furniture Solutions, LLC ("Blue") is a Florida company with its principal place of business in Medly, Florida.  Since at least June 2011, Blue has been engaged in the importation of wooden bedroom furniture from the People's Republic of

2

China ("PRC") and its sale in the United States.  At times relevant to this Complaint, Blue's members were Yingqing Zeng and Alexander C. Cheng.

4.      Defendant XMillenium LLC is a Florida corporation with its principal place of business in Medley, Florida.  XMillenium was formed in 2015 to assume certain contracts of Blue for the sale of PRC-manufactured wooden bedroom furniture in an effort to hide assets from creditors, including the United States.  XMillenium's manager is XM Manager LLC, a Delaware LLC.  The Managing Members of XM Manager LLC are Alexander C. Cheng and Yingqing Zeng.

5.      Defendant Yingqing "Jeff" Zeng is the founder and president of Blue and, through XM Manager, a managing member of XMillenium.  Zeng is a U.S. Citizen and resident of Florida.

6.      Defendant Alexander C. Cheng is an owner and manager of Blue and serves as Chief Financial Officer.  Through XM Manager, Cheng is a managing member of XMillenium.  Cheng is a U.S. Citizen and resident of North Carolina.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

8.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a).  Defendants Blue, XMillenium, Zeng and Cheng have transacted business in this District.  Some of the shipments of wooden bedroom furniture were shipped into and delivered to customers in this District.

## FACTS

### I.   Customs Duties and Fees

9.     All merchandise imported into the United States is required to be "entered," unless specifically excepted.  19 U.S.C. §1484; 19 C.F.R. § 141.4(a).  "Entry" means, among other things, that an importer or its agent (usually a licensed customs broker acting on behalf of the importer) must file appropriate documents with an officer of CBP that allows Customs to assess the customs duties and fees due on the merchandise being imported into the United States. 19 C.F.R. § 141.0a(a).

10.     Importers are required to file an entry summary (CBP Form 7501).  Among other things, the entry summary contains the date of import, the importer of record, a code signifying the entry type (including whether the entry contains any items subject to anti-dumping duties), and the value of the items.  The entry summary also must contain the appropriate eight-digit subheading from the Harmonized Tariff Schedule of the United States ("HTSUS Code") that best describes each item of merchandise. 19 C.F.R. § 142.6.

11.     Importers are required to maintain, and submit upon request, documentation supporting the statements made on the Entry Summary.  Such documentation includes a Commercial Invoice, a Packing List, a Country of Origin Certificate, and a Bill of Lading. See, e.g., 19 C.F.R. §§ 141.11, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a).

12.     The value or approximate value of the imported merchandise must be declared in the commercial invoice and entry summary. 19 C.F.R. § 142.6.

13.     The commercial invoice must also contain an adequate description of the merchandise, including quantity and price.  19 C.F.R. § 141.86.

4

14.     Pursuant to 19 U.S.C. § 1484, the entity serving as "importer of record" is assigned the responsibility of paying the duty and using reasonable care in making and providing accurate documentation to Customs.  An importer of record is responsible for ensuring that the imported goods comply with the local laws, filing a completed duty entry and associated documents with the Customs, and paying the import duties and other fees on those goods.

15.     Federal law provides that every importer must file a declaration stating that the values and all other statements set forth on these documents and the entry itself are true and correct.  19 U.S.C. § 1485.

16.     The entry summary form includes a declaration that "I certify that the above information is accurate, the bond is sufficient, valid and current, and that all requirements of 19 CFR Part 142 have been met."

**A.     <u>Anti-dumping Duties on Wooden Bedroom Furniture</u>**

17.     In addition to regular customs duties, the United States may levy duties on imported goods that are being dumped (i.e., sold in the United States at prices below the producer's cost of production or sales price in the country of origin) or for which foreign manufacturers are receiving unfair subsidies.  19 U.S.C. §§ 1671, 1673.  Anti-dumping duties are imposed to counter dumping.  The duties are meant to level the playing field for domestic manufacturers by compensating for any unfair advantage gained by foreign manufacturers.

18.     Anti-dumping duties are levied when the U.S. International Trade Commission (ITC) determines that a U.S. domestic industry is being materially injured and Commerce determines that imports are being dumped in the United States.  Commerce sets an ad valorem duty rate, which is multiplied by the value of the merchandise entering the United States (the "entered value") to determine the amount of anti-dumping duties owed. 19 C.F.R. § 351.212(b).  For example, if a duty rate is 30 percent, the duty owed on merchandise valued at $100 would be 30 percent of $100, or $30.

19.     When imposing anti-dumping duties, Commerce issues a duty order that describes the merchandise subject to the additional duties (the "scope of the order") in terms of the type of merchandise and the country of origin of that merchandise.

20.     Duties are owed to Customs on importation.  19 C.F.R. § 141.1(a).

21.     The entry summary requires the importer to identify a two-digit code for the entry type.  When anti-dumping or countervailing duties are owed, importers must identify the "03" entry type in the specified Block of the entry summary.

22.     Guidance published by Customs in February 2004 poses a series of questions to help importers ensure that they are exercising reasonable care when declaring the amount of duties owed.  For example, one of the questions is, "Have you taken measures or developed reliable procedures to check to see if your goods are subject to a Commerce Department dumping or countervailing duty investigation or determination, and if so, have you complied or developed reliable procedures to ensure compliance with Customs reporting requirements upon entry (e.g., 19 C.F.R. § 141.61)?"  Customs, Reasonable Care (A Checklist for Compliance) 12 (2004) (Reasonable Care Guidance).

23.     The Reasonable Care Guidance also poses questions to help importers ensure they are exercising reasonable care in declaring the country of origin and value of imported goods.  For instance, it asks whether the importer has established reliable procedures, consulted with an expert, and obtained a ruling from Customs.  *Id.* at 10-11.

24.     In October 2003, an association of U.S. manufacturers of wooden bedroom furniture and labor unions petitioned the U.S. International Trade Commission (ITC) and Commerce to investigate possible dumping by manufacturers of wooden bedroom furniture in the People's Republic of China (PRC).

25.     In January 2004, the ITC issued its preliminary determination that there was a reasonable indication that an industry in the United States was threatened with material injury by reason of imports from the PRC of wooden bedroom furniture.  69 Fed. Reg. 4,178 (Jan. 28, 2004).

26.     In June 2004, Commerce issued its preliminary determination that wooden bedroom furniture from the PRC was being, or was likely to be, sold in the United States at less than fair market value.  69 Fed. Reg. 35,312 (June 24, 2004).

27.     In November 2004, Commerce issued its final determination, which was amended and issued along with the order in January 2005.  70 Fed. Reg. 329 (Jan. 4, 2005).

28.     The scope of the order is set forth in detail in the Federal Register, and is generally stated as:

> [t]he product covered by the order is wooden bedroom furniture. Wooden bedroom furniture is generally, but not exclusively, designed, manufactured, and offered for sale in coordinated groups, or bedrooms, in which all of the individual pieces are of approximately the same style and approximately the same material and/or finish. The subject

merchandise is made substantially of wood products, including both solid wood and engineered wood products made from wood particles, fibers, or other wooden materials such as plywood, oriented strand board, particle board, and fiberboard, with or without wood veneers, wood overlays, or laminates, with or without non-wood components or trim such as metal, marble, leather, glass, plastic, or other resins, and whether or not assembled, completed, or finished.

The subject merchandise includes the following items: (1) Wooden beds such as loft beds, bunk beds, and other beds; (2) wooden headboards for beds (whether stand-alone or attached to side rails), wooden footboards for beds, wooden side rails for beds, and wooden canopies for beds; (3) night tables, night stands, dressers, commodes, bureaus, mule chests, gentlemen's chests, bachelor's chests, lingerie chests, wardrobes, vanities, chessers, chifforobes, and wardrobe-type cabinets; (4) dressers with framed glass mirrors that are attached to, incorporated in, sit on, or hang over the dresser; (5) chests-on-chests, highboys, lowboys, chests of drawers, chests, door chests, chiffoniers, hutches, and armoires; (6) desks, computer stands, filing cabinets, book cases, or writing tables that are attached to or incorporated in the subject merchandise; and (7) other bedroom furniture consistent with the above list.

*Id.* (footnotes omitted).

29.     Commerce assigns a case number to each investigation into whether anti-dumping duties should be imposed.  When such duties are owed, importers must identify the applicable case number on the Entry Summary.  Case A–570–890 relates to anti-dumping duties on wooden bedroom furniture from the PRC.  76 Fed. Reg. 30,650 (May 26, 2011).

30.     At all times relevant to this Complaint, the PRC-wide anti-dumping duty rate for wooden bedroom furniture was 216.01%.  The PRC-wide rate applies to all exporters not specifically granted a "separate rate" by Commerce.  In order to establish eligibility for a "separate rate," an exporter must demonstrate that its export activities are both *de jure* and *de facto* independent of government control.

31.     The imposition of anti-dumping duties made it unprofitable for U.S. companies with Chinese manufacturers to import wooden bedroom furniture within the scope of the order.

**B.     Merchandise Processing Fees**

32.     Formal and informal entries are subject to a Merchandise Processing Fee at the time of entry.  19 C.F.R. 24.23(b)(1).  The fee is set at 0.3464% of the value of the merchandise being imported, as determined under 19 U.S.C. § 1401a and 19 C.F.R. § 152.103.  The maximum fee charged per entry is $485 and the minimum is $25. 19 C.F.R. 24.23(b)(1)(i)(B).  The fee is listed on the Entry Summary, CBP Form 7501.

**C.     Harbor Maintenance Fee**

33.     The Harbor Maintenance Fee is intended to require those who benefit from maintenance of U.S. ports and harbors to share the cost of the maintenance.  The fee is assessed as 0.125% of the value of the commercial cargo.  19 C.F.R. 24.24; 19 C.F.R. § 152.103.  The fee is listed on the Entry Summary, CBP Form 7501.

**II.     Defendants' Scheme to Evade Customs Duties and Fees**

34.     To avoid the payment of anti-dumping duties and fees, defendants conspired with their Chinese manufacturers and exporters to fraudulently avoid customs duties and underpay fees owed to the United States by making false representations in entry documents about the nature and value of the imported merchandise.

**A.**     <u>**Scheme to Avoid Antidumping Duties**</u>

35.     Blue Furniture Solutions ("Blue") was incorporated in March 2011 and began importing furniture in June 2011.  Prior to incorporating Blue Furniture Solutions, Zeng imported wooden bedroom furniture under the name Blue Imports.

36.     Blue specialized in importing furniture to furnish student apartments and dormitories.  Blue sold furniture in coordinated bedroom groupings, including beds, dressers and chests, wardrobes and nightstands, as well as furniture for living and dining areas.  Most of the bedroom furniture was made of laminated particle board and/or medium-density fiberboard ("MDF") with a steel frame, although Blue also sold solid wood and/or laminated particle board and/or MDF furniture with no metal frame.   All of the chests, dressers, nightstands and wardrobes imported by Blue were subject to anti-dumping duties, and many of the beds were also within the scope of the anti-dumping order.

37.     The anti-dumping rate of 216.01% on Chinese-made wooden bedroom furniture was intended to, and did, make importing this furniture prohibitively expensive.  However, Blue decided to evade these duties, in order to profit from its China-based business model.  Blue engaged in a scheme to make numerous false statements to Customs and its own agents in order to avoid paying duties.

38.     For example, the Customs summary entry (Form 7501) requires entries subject to anti-dumping duties to be identified with the code "03".  Pursuant to their scheme to avoid these duties, defendants falsely identified, conspired to falsely identify and caused to be falsely identified its entries with the code "01," rather than "03."  The code "01" signifies that the merchandise being entered is not subject to anti-dumping duties.

39.     The Customs summary entry form and supporting documents, such as the commercial invoice, require the importer to accurately describe the merchandise being entered, and to choose an appropriate HTSUS code to identify the items.  Pursuant to their scheme to avoid anti-dumping duties, defendants misrepresented and misclassified the furniture to hide the fact that it was wooden bedroom furniture subject to 216.1% anti-dumping duties.

40.     For example, from 2011 through 2014, defendants primarily used the HTSUS Code 9403.2000.18 for dressers, beds and nightstands that they imported.  This code is the code for "Metal Household Furniture, Others."  This code was deliberately chosen in place of 9403.50.9080, the code for "wooden furniture of a kind used in the bedroom."  On their commercial invoices and packing lists, defendants misrepresented dressers, chests and nightstands as "metal" rather than as being substantially particle board, MDF or wood, which would bring them within the scope of the anti-dumping order.

41.     Beginning in 2015, defendants began using different descriptions to further conceal the nature of the furniture.  For example, defendants began mislabeling their dressers and chests as "file cabinets" or "storage cabinets."  Defendants used the description "side table" instead of nightstand.  Wooden parts of beds were imported using the description "desk board" and "book shelves."  Defendants falsely used the HTSUS Codes 9403.20.0018, which is for "Other Metal Furniture, Household, Other" and 9403.20.0020, a subpart of metal household furniture intended to describe "Counters, lockers, racks, display cases, shelves, partitions and similar fixtures."

42.     In furtherance of the scheme, in order avoid detection, defendants instructed their China-based agents, manufacturers and exporters how to mislabel and misclassify the merchandise on documents intended to be presented to Customs, and misled Customs brokers as to the materials in the furniture.

43.     For example, in June 2012, a China-based agent, responding to a question from a new customs broker that Blue had not previously used, told the broker that the HTSUS code for a bed should be "9403509990" – "wooden furniture of a kind used in the bedroom."  Defendant Zeng told the broker that the bed was metal.  Zeng then redirected all incoming shipments, which contained dressers, chests and nightstands, away from the questioning broker to a different brokerage agency, and that company was not used again.

44.     Defendant Zeng then admonished the China-based agent that she must pay special attention when preparing Blue's customs documents, in particular for nightstands, chests and beds, which he emphasized must be described as metal-framed.  The agent responded that she redid the customs clearance documents for the next shipment, for "anti-dumping," adding "metal frame" to the chest, wardrobe and nightstands in that entry – items that were plainly within the scope of the anti-dumping order.

45.     In January 2013, another customs broker questioned the nature of the furniture, emailing a Blue employee: "Please advise if the material for the product you are bringing is wood or metal?  For customs purposes."  Zeng responded, attaching an invoice and packing list where he noted "metal" next to the entry for "Chest 4 drawers."  He also told the broker, "For future reference, if you have question regarding materials please send

to me directly."   The Chest was in fact made of laminated particle board/MDF with a metal frame, within the scope of the anti-dumping order.

46.     In January 2015, another Chinese manufacturer sent an email to Blue, asking Blue's office manager to check the product names that Blue wanted used on the packing lists and commercial invoices.  The manufacturer sent a product list containing pictures of the items.  The office manager wrote back, cc'ing Zeng, that the two-drawer chest pictured should be called a "wall cabinet," and the taller dresser should be "file cabinet."  Zeng responded:

> 2D Chest-  Storage Cabinet – Metal
> 4 D Chest- File Cabinet – Metal

The items pictured were clearly wooden bedroom furniture within the scope of the anti-dumping order but were entered through Customs with packing lists and invoices reflecting the false names and descriptions.

47.     On March 14, 2015, the Chinese agent again requested confirmation on how to label the products, with its understanding of the term to the right of the picture.  Blue responded with an added column to the spreadsheet, on the far right:



| | Storage Cabinet – Metal | Yes |
| | File Cabinet - Metal | Yes |

| | | |
|---|---|---|
|  | **Side Table** | Yes |
|  | **Cabinet** | Please also call - File Cabinet |
| 衣柜呢？要改名字么？ | | Please also call - Storage Cabinet |

The Chinese translates in part to "Wardrobe?"  The "side table" pictured was sold by Blue as a nightstand.

48.     The Chinese agent also asked how to describe the beds on the customs documents.  Blue's office manager responded, copying Zeng and Cheng, regarding how to falsely describe them:

 1) if the metal bed comes with 1 pc of wood => Please separate the wood piece called "Desk Board"
2) If Platform bed => Please separate the wood shelves called "Book Shelf."

49.     Because mislabeling items could cause problems for the installers trying to unpack shipping containers and match the furniture to its place in the apartments, Blue instructed its Chinese manufacturer to provide one commercial invoice and packing list for Customs, and another packing list for Blue's use in installation.  Blue and its Chinese agent referred to this second, truthful, list as a "detailed packing list."  For example, where the packing list for Customs would list a quantity of "metal file cabinet," the "detailed packing list would refer to a "dresser."  In one case, Blue's office manager emailed the China agent:

> Please urgently provide detailed packing list for all containers
> you ship for NJ01. Sorry for the push, we need to plan
> everything ahead of time for this project because the delivery
> deadline in New Jersey is 04/01.

After the agent said she could not get to it immediately, and provided only the commercial invoice prepared for customs, the office manager sent the invoice to the installers, copying Zeng and Cheng, and told the installers:

> Hi, David/Allen, this following information is just for customs
> clearance. Over this weekend, China will provide a better
> detailed packing list for all these containers coming for New
> Jersey Project. Thanks Joaan

50.     In June 2015, a Blue shipment was stopped for inspection by Customs in Seattle.  The Customs import specialist determined that chests and beds contained in the shipment were subject to the anti-dumping order.  In furtherance of their scheme, defendants lied and caused others to lie to Customs officials about the items in the stopped shipment and later shipments.

51.     For example, the beds in the stopped shipment had particle board/MDF headboards, footboards and side boards.  Blue falsely told Customs that these components of the bed were sold separately from the metal frames, despite the fact that the beds were *en route* to fulfill an order for complete beds with all of the pieces.  The import specialist rejected Blue's statement and found that, since the number of wood pieces matched the number of frames, they were intended for use together.  Customs assessed anti-dumping duties on these items.

52.     The import specialist also notified Blue that the so-called "File Cabinets" were misclassified.  Customs found that the items were entered as "a metal filing cabinet:

with the HTSUS code 9403.10.0020, but should be classified as 9403.50.9080 "wooden furniture of a kind use in the bedroom."

53.     In response to Customs' finding regarding the "file cabinet," defendant Zeng told the logistics company, which relayed the response to the broker, that the

> chests were mislabeled by the manufacturer as 'file cabinet.' We correctly the classification for this shipment, and will make sure all future shipments be declared under the correct classification.

Defendant Cheng was cc'd on this email as well as others concerning Custom's investigation and findings.  These statements were false and misleading, because defendants had instructed the manufacturer to label the chests as "file cabinets" in order to evade anti-dumping duties.

54.     Moreover, defendants did not "make sure all future shipments [were] declared under the correct classification."  Rather, defendants doubled down on their scheme.

55.     On June 24, 2015, at defendant Cheng's request, a Blue employee calculated the anti-dumping duties owed on chests for all incoming shipments at that time.  The duty owed, according to Blue's calculation, totaled approximately $110K.  Rather than pay the duties, defendant Cheng instructed Blue employees to rework the invoices and packing lists to be provided to Customs.  Cheng had a Blue employee create an image of Blue's dresser with files in the bottom drawer.  This image was then added to the packing lists and invoices provided to Customs.  These items were then falsely labeled on the official packing list and commercial invoice as "File Cabinet (Particle Board)," and entered under HTSUS 9403.30.8000 "Other wooden office furniture."   However, these items were the same type

ofdressers that Blue had previously claimed were mislabeled by the manufacturer, and were sold by Blue for a bedroom group.

56.     In July 2015, a broker inquired about a shipment that appeared to be the same items as those that had been stopped by Customs in Seattle and assessed duties.  Cheng told the logistics company, which had relayed the inquiry, to respond as follows:

> These 2 items are not belonging to Anti-Dumping. Please explain to broker -
> 1) Side Table – This is the living room furniture, same function like end table …
> 2) File Cabinet – This is for File or Stationary storage purpose.  We have many similar items … but they are different from the [] Anti-Dumping Items.
>
> …
> the file cabinets in this container may resemble the 2-drawer chests in our shipment to Boise [which were assessed ADD], but they are different SKU and are designed and used as file cabinets

This information was false, as Cheng well knew the items had been sold for use in the bedroom as dressers and nightstands.

57.     In October 2015, defendants Zeng and Cheng learned of the United States' investigation into the evasion of anti-dumping duties.  As part of the scheme, in order to further conceal their illegal activities, and their assets, Zeng and Cheng formed two new companies, XMillenium LLC and XM Managers, LLC, a Delaware LLC.  XM Managers was owned by Zeng and Cheng.  In turn, XM Managers was the sole member of XMillenium.  Cheng and Zeng then transferred Blue's remaining contracts for Chinese-made wooden bedroom furniture to XMillenium.

**B.     Examples of Defendants' Fraudulent Entries**

58.     Attachment A contains a list of entries presently known to the United States, on which defendants evaded payment of anti-dumping duties.  Each of these entries contain

multiple false statements, including the entry type, HTSUS Code, descriptions, and price.

Some specific examples from these entries are described below.

             **1)**      **Wildwood of San Marcos, San Marcos, TX**

      59.     On or about March 2013, Blue entered into a contract to supply furniture for

a student apartment complex called Wildwood of San Marcos, in San Marcos, Texas.

Among other things, the contract provided for the purchase of 1056 two-drawer chests

designed to fit under a bed and 528 nightstands.

      60.     In late June/early July 2013, the nightstands were imported as follows:

| Entry No. | Date | Number of Nightstands (pieces) |
|-----------|------|-------------------------------|
| JF7-0105605-9 | July 3, 2013 | 528 |
| JF7-0105455-9 | June 27, 2013 | 528 |
| JF7-0105604-2 | July 3, 2013 | 128/133 |

      In each case, the entry summary falsely represented that the entry type was "01" –

not subject to duty.  The HTSUS Code used was 9403.20.0018 "household metal

furniture/parts, other."  The commercial invoice provided to Customs described the item as

"Metal Nightstand," while the packing list referred to "Nightstand (Steel)."

      61.     In late June/early July 2013, chests for the project were imported as follows:

| Entry No. | Date | Number of Chests |
|-----------|------|------------------|
| JF7-0105455-9 | June 26, 2013 | 355 |
| JF7-0105791-7 | July 10, 2013 | 344 |

| JF7-0105604-2 | July 3, 2013 | 257 |
|---|---|---|

62.     In each entry, the entry summary falsely represented that the entry type was "01" – not subject to duty.  The HTSUS Code used was 9403.20.0018 "household metal furniture/parts, other."  The commercial invoice provided to Customs described the item as "Metal Chest 2 Drawer," while the packing list referred to "Chest 2 Drawers (Steel)."

63.     On/about June 24, 2015, a Blue employee forwarded a "detailed packing list," received from the manufacturer, to Blue's installers.  Unlike the packing list provided to Customs, which simply described a "Nightstand (Steel), the "detailed packing list" described a nightstand with 5 pieces, including a "Wood Top."  Unlike the packing list provided to Customs, which includes a "Chest 2 Drawers (Steel), the "detailed packing list" described a "2D dresser."  The items sold for the Wildwood project were substantially similar to those pictured here:



These items are within the scope of the anti-dumping order.

64.     The invoices provided to Customs also falsely listed the value of each nightstand as $10.50, for a total entered amount of $5,544.00.  In fact, the value was approximately $38.00 each, for a total value of $20,064.00.  The antidumping duty owed, and evaded by defendants, is $43,338.24 on these nightstands alone.  The declared value of

the chests was approximately $40.60 each, while the true value was approximately $58

each.  For 956 chests, the antidumping duty evaded was $119,823.13.

2)      **University Heights, San Marcos, TX**

65.     On May 1, 2015, Blue entered into a contract to sell certain furniture to

furnish a development known as University Heights, in San Marcos, Texas.  Among the

items to be sold were 64 dressers.  The contract for the project described the items variously

as "Dresser (4 drawers)" and "4 Drawers Chest (Stackable)".  The item is pictured in the

contract as below:



66.     On/about August 3, 2015, the dressers were entered through Customs (entry

number 9UA-0204283-8.  The entry summary falsely represented that the entry type was

"01" – not subject to duty.  The HTSUS Code used was 9403.60.8081 "Other wooden

furniture, other, other."  The commercial invoice and packing list provided to Customs

described the item as "File Cabinet (Particle Board)."  The packing list also had a

photoshopped picture, with files in the bottom drawer:



67.     On August 4, 2015, a Blue employee forwarded a so-called "detailed packing list" received from the manufacturer to Blue's installers on the University Heights project. This packing list noted that the shipping container contained (among other things) 64 "Chest (4 Drawers)."  There was no mention of file cabinets on this packing list.

68.     The invoice provided to Customs falsely listed the value of each dresser as $50.00, for a total entered amount of $3,200.00.  In fact, the value was $106.00 each, for a total value of $6,784.  The antidumping duty owed, and evaded by defendants, is $14,660.22 on these dressers alone.

### 3)     The Ballpark West/East, Austin, TX

69.     On May 15, 2015, Blue entered into a contract to sell certain furniture to furnish a development known as The Ballpark at Austin, in Austin, Texas.  The contract included "2D Chest[s]" as part of the bedroom furnishing.

70.     On August 11, 2015, a Blue employee sent a Commercial Invoice and Packing list for the shipment that included the chests to Blue's logistics agent/customs broker.  Zeng and Cheng were copied on the email with these documents.  The Commercial Invoice listed 187 "File Cabinet[s] (Particle Board)" valued at $48.00 each.  The Packing List also listed "File Cabinet (Particle Board)."

71.     On August 17, 2015, the same employee sent a "detailed packing list" to Blue's installers which listed 187 "Chest (2 drawers)."

72.     On/about August 13, 2015, the chests were entered through Customs (entry number 791-0469174-1.  The entry summary falsely represented that the entry type was "01" – not subject to duty.  The HTSUS Code used was 9403.20.0030 "Other metal furniture/parts."  The commercial invoice and packing list provided to Customs described the item as "File Cabinet (Particle Board)."

73.     The declared value of the chests was $8,976.00.  Assuming that value was truthful, defendants evaded $19,397.13 in antidumping duties on this shipment.

### 4)     Reflections Apartment, Tampa, Florida

74.     On June 5, 2015, Blue signed a contract, effective April 17, 2015, for the sale of furniture to furnish the Reflections Apartments in Tampa, Florida.  Among other things, the contract included 51 "Custom design storage bed[s] with Headboard Shelf Cabinet" that were shown as:  and 51 "Custom Design 5 Drawers Chest[s[]" that were

shown as:  .

75.     On/about July 20, 2015, Blue entered the dressers and beds under entry number 9UA-0203954-5.  The entry summary falsely represented that the entry type was "01" – not subject to duty.  The HTSUS Code used for the dressers was 9403.30.8000

"Other wooden office furniture."  The commercial invoice provided to Customs described

the item as "Wood File Cabinet," while the Packing List described the item as "File Cabinet

(Particle Board)," helpfully adding the photoshopped image of the dresser with files:



The HTSUS Code used for the beds was 9403.20.0018 "Household Metal Furniture,"  and

the description given on both the Commercial Invoice and the Packing List was "Metal

Frame Bed."  The photo provided on the Packing List given to Customs was:



BFBED23-A

76.     On July 16, 2015, a Blue employee emailed the "detailed packing list" for the

shipping container that contained the beds for the project.  This packing list contained a

listing of nine separate parts for the beds, including: "Bed Board – Round tube + Bed Head

+ Bed End + Bottom Frame + Connection Square Steel," "Wood Cabinet," "Bed End

Board," and "Side Board."  On July 27, 2015, the employee emailed the installer the

"Detailed PL" for the shipping container that contained the dressers and another piece of the

beds, which were described as "Chest (5 drawers)" and "Bed" – "Backrest Cabinet," respectively.

77.     According to the calculation that a Blue employee did for Cheng and Zeng regarding antidumping duty, the chests in this shipment were declared to Customs to have a value of $63.00 each, when in fact they were purchased for $125.00.  The antidumping duty owed on the chests, and fraudulently evaded, is $13,770.64.  The antidumping duty evaded on the beds was at least $12,236.97.

### C. <u>Scheme to Avoid Merchandise Processing and Harbor Maintenance Fees</u>

78.     Defendants also engaged in a scheme to understate the value of their imported goods, in order to avoid the full payment of the Merchandise Processing Fee and Harbor Maintenance Fee.

79.     Defendants Zeng and Cheng had knowledge that Blue was falsely stating the value of its imports, and thereby fraudulently reducing the amount of fees that Blue paid.  At Cheng's request, Blue's office manager prepared an analysis of the amount saved on the Merchandise Processing Fee and the Harbor Maintenance fee by understating the value of the imported merchandise.  The analysis, which was provided to Cheng and Zeng on September 5, 2013, compared all of the actual prices for fifteen different types of items imported for a single project to the prices listed on the commercial invoices presented to Customs.  The office manager told Zeng and Cheng, "If we show the actual value on all commercial invoices, the whole Chandler Crossing Project – we are talking about Furniture only – will cost at around $2,980 more than we are paying now."  The document shows that Blue was undervaluing all of the items by approximately 30%.

  
80.     These false valuations were presented to Customs, resulting in lower fees assessed.  For example, on or about July 12, 2013, defendants caused to be filed an entry summary and supporting documentation for entry number JF7-0105770-1 that falsely gave the value of numerous items.  This included 222 2-drawer chests entered at a value of $40.60 each, when in fact the value was $58.00 each.  These false statements caused Customs to assess lower Merchandise Processing and Harbor Maintenance Fees than would otherwise have been assessed.

81.     In 2015, defendants undervalued the imported merchandise by half.  For example, on/about August 1, 2015, on the entry summary for entry number 9UA-0204283-8, defendants falsely provided a commercial invoice that showed that the cost of a "file cabinet" was $50.00 each, when in fact it was $106.00.  These false statements caused Customs to assess lower Merchandise Processing and Harbor Maintenance Fees than would otherwise have been assessed.

## III.   **False Statements to Customs**

82.     The anti-dumping duty order on wooden bedroom furniture from the PRC applies to all of the imports listed on Attachment A, which are imports of wooden bedroom furniture by defendants Blue and XMillenium.

83.     Upon importation of each shipment, defendants' customs brokers, acting as defendants' agents, submitted to Customs an entry summary (CBP Form 7501).

84.     For all entries of imports listed on Attachment A, defendants falsely declared, conspired to declare, or caused to be declared, the code "01" in on the summary

entry form.  By entering "01" rather than "03," defendants falsely declared, conspired to declare, or caused to be declared that the entry was not subject to anti-dumping duties.

85.     For all entries of imports listed on Attachment A, defendants falsely represented, conspired to represent or caused to be represented, the nature of the imports, in that the imports were falsely described in import documentation provided to Customs, and/or were misclassified by using a false HTSUS code.

86.     For each of the entries on Attachment A, on the Entry Summary submitted to Customs, the amount of duties defendants declared or caused to be declared or conspired to have declared as owed on the import is false.  The actual amount of duties owed is much higher since defendants undervalued the furniture and did not include applicable anti-dumping duties.

87.     For each of the entries on Attachment A, on the Entry Summary submitted to Customs, the amount of fees defendants declared or caused to be declared or conspired to have declared as owed on the entry is false.  The actual amount of fees owed is much higher since defendants undervalued the merchandise.

88.     Defendants knowingly, or with deliberate ignorance or reckless disregard, used false entry summaries and invoices with the intention and expectation that the Government would reasonably rely on the false codes, misrepresentations and misstated values stated on the entry documents.

89.     Defendants' false entry summaries and invoices were material to the Government's assessment and collection of anti-dumping duties and fees.

90.     Defendants' false entry summaries and invoices caused defendants to pay less than the amount of anti-dumping duties and fees owed to Customs.

91.     In total, the government estimates that defendants underpaid customs duties and fees by millions of dollars since 2011.

## Count 1

### Violation of the False Claims Act

### 31 U.S.C. § 3729(a)(1)(G)

92.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 91.

93.     In violation of 31 U.S.C. § 3729(a)(1)(G), defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government.

94.     By means of these false statements, defendants decreased the amount of customs duties they paid on imports of wooden bedroom furniture, and fees paid on all merchandise imported, in an amount to be determined at trial.

## Count 2

### Violation of the False Claims Act

### 31 U.S.C. § 3729(a)(1)(C)

95.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 91.

96.     In violation of 31 U.S.C. § 3729(a)(1)(C), defendants conspired to commit a violation of subparagraph (G) of 31 U.S.C. § 3729(a)(1).

97.     Thus, defendants conspired to knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government.

98.     As a result of this conspiracy, the United States was damaged in an amount to be determined at trial.

## Count 3

### Unjust Enrichment

99.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 91.

100.     By reason of the false statements submitted to the Government regarding the duties owed on imports of wooden bedroom furniture and fees owed on all imports, defendants avoided paying duties and fees owed to the United States, and were thereby unjustly enriched in an amount to be determined at trial.

**<u>Prayer for Relief</u>**

WHEREFORE, Plaintiff, the United States of America, prays for judgment against all

defendants, jointly and severally, as follows:

A.   On Count 1, for judgment against defendants for statutory penalties and

   treble damages as provided in the False Claims Act and for such other relief

   as the Court deems just and proper;

B.   On Count 2, for judgment against defendants for statutory penalties and

   treble damages as provided in the False Claims Act and for such other relief

   as the Court deems just and proper;

C.   On Count 3, for judgment against defendants in the amount they have been

   unjustly enriched.

**JURY TRIAL DEMAND**

The United States demands trial by jury as to all issues so triable.

August 10, 2017                    Respectfully submitted,

                         **RICHARD L. DURBIN, JR.**
                         United States Attorney


                         */s/  SUSAN STRAWN*
                         **SUSAN STRAWN**
                         Tex. Bar No. 19374330
                         Assistant United States Attorney
                         601 NW Loop 410, Ste 600
                         San Antonio, TX 78216
                         Tel. (210) 384-7388
                         Fax (210)384-7322
                         SStrawn@usa.doj.gov
                         *Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the United States Complaint-in-Intervention and Demand for Jury Trial to be served via the Court's electronic notification system on relator's counsel:

Steven D. Smit


and by electronic mail on:

Jacqueline M. Arango
Akerman LLP
3 Brickell City Centre
98 Southeast Seventh St.
Miami, FL 33131
jacqueline.arango@akerman.com

Counsel for Defendants



*/s/ SUSAN STRAWN*
SUSAN STRAWN
Assistant United States Attorney